## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **JEREL HENDERSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | |
| **CGL COMPANIES, LLC and** | ) | _____ |
| **HUNT COMPANIES BUSINESS** | ) | |
| **SERVICES, LLC, and MARK** | ) | **JURY TRIAL DEMANDED** |
| **CAMPBELL,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

COMES NOW Plaintiff Jerel Henderson ("Plaintiff" or "Mr. Henderson"), and by and through his undersigned counsel, hereby brings the following claims against Defendants CGL Companies, LLC, Hunt Companies Business Services, LLC and Mark Campbell (collectively "Defendants"). In support thereof, Plaintiff states the following:

### JURISDICTION AND VENUE

1.      This action seeks damages for wage discrimination in violation of the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. 206(d), *et seq.* and retaliation in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*

2.      This Court has subject matter jurisdiction over Plaintiff's EPA and FLSA claims pursuant to 28 U.S.C. § 1331.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and Rule 3.1 of the Local Rules of the Northern District of Georgia because Defendants transact business in this judicial district and the events giving rise to these claims occurred in this judicial district and division.

**PARTIES**

4.      Plaintiff Jerel Henderson is, and at all times relevant to the Complaint was, an adult resident of Atlanta, Fulton County, Georgia.

5.      At all times relevant to this Complaint, Plaintiff was an employee of the Defendants as defined by the FLSA. 29 U.S.C. § 203(e)(1).

6.      Plaintiff is, and at all times relevant to the Complaint was, protected by the FLSA because his work for Defendants regularly involved interstate commerce.

7.      Defendant CGL Companies, LLC ("CGL"), is a foreign limited liability company wholly owned by Defendant Hunt.

8.      Defendant CGL's principal place of business is 601 North Mesa, Suite 1900, El Paso, Texas 79901.

9.      Defendant CGL conducts business in the state of Georgia at two addresses: 11175 Cicero Drive Suite 500 Alpharetta, Georgia 30022 and 1903 Phoenix Blvd Suite 250, Atlanta, Georgia 30349.

10. Defendant Hunt Companies Business Services, LLC ("Hunt"), is a foreign limited liability company, with its principal place of business at 601 North Mesa, Suite 1900, El Paso, Texas 79901.

11. Defendant Mark Campbell ("Campbell") is an adult who, upon information and belief, resides in Gainesville, Hall County, Georgia.

12. At all times relevant to this Complaint, Defendant Campbell was a manager who exercised operational control over pay practices and participated in retaliatory actions, based on his direct role in enforcing compensation decisions, denying Plaintiff's advancement, diluting promotions, and enforcing upper-management's hostility toward protected pay discussions.

13. At all times relevant to this Complaint, Defendants were Plaintiff's employers as defined by the FLSA. 29 U.S.C. § 203(d).

14. Defendants CGL and Hunt are enterprises covered by the FLSA, as they have at least two employees and an annual dollar volume of sales or business of at least $500,000.

15. Defendants CGL and Hunt may be served with the Summons and Complaint through their registered agent, Capitol Corporate Services, Inc., 3675 Crestwood Parkway, N.W., Suite 350, Duluth, Georgia 30096 in Gwinnett County.

3

16.     Defendant Campbell may be served at Defendant CGL's business locations or at his home which, upon information and belief, is located at 7374 Berry Hill Dr., Gainesville, Georgia 30507 in Hall County.

## STATEMENT OF FACTS

**A. Defendants CGL and Hunt operated as joint employers or, in the alternative, as a single integrated enterprise.**

17.     Defendant CGL provides justice facility planning, design, program management, maintenance, and condition assessment consulting nationwide.

18.     Defendant Hunt provides operational and administrative direction and support to Defendant CGL through shared resources in the Human Resources, Accounting, and Finance Departments.

19.     For example, Defendant CGL's Human Resource Director reports to Defendant Hunt's Vice President of Human Resources.

20.     Defendant Hunt exercises a high degree of control over the terms and conditions of CGL employees, including the Plaintiff and, as such, is a joint or single enterprise employer along with Defendant CGL.

**B. Defendants hired Plaintiff who performed excellently in his role.**

21.     Plaintiff, Mr. Henderson, is male.

22.     Mr. Henderson holds a Bachelor of Science in Electrical Engineering from an ABET-accredited university, along with several years of in-person

4

participation with Holberton School, a computer science and full stack software engineering program based in San Francisco, California.

23.    Plaintiff was hired by the Defendants on or about February 28, 2022, as a CMMS/Cellular IT Support Assistant.

24.    Plaintiff worked at Defendant CGL's office located at 1903 Phoenix Blvd., Suite 250, Atlanta, Georgia 30349.

25.    His base salary at hire was $47,840.

26.    Defendants classified Plaintiff's role as FLSA non-exempt.

27.    From his start date through October 16, 2025, Plaintiff earned and was paid approximately $35,634.39 in overtime wages.

28.    As a CMMS/Cellular IT Support Assistant, Plaintiff reported first to Michael Peraza, Director of IT.

29.    Mr. Peraza reported to Eli Gage, the current Chief Executive Officer.

30.    Plaintiff was required to and did perform job functions that far exceeded his capacity as a CMMS/Cellular IT Support Assistant.

31.    Specifically, beginning March 14, 2022, Mr. Henderson absorbed the non-managerial technical duties of the former IT Program Manager Joseph "Bob" Cole and performed at or above the level of an FLSA exempt IT System Administrator, which involved more complicated and consequential tasks.

5

32. Following Mr. Peraza's resignation in September 2022, Greg Westbrook, current Chief Operations Officer, relied on Plaintiff to lead the team.

33. In October 2022, Mr. Westbrook told Plaintiff that once a new IT Director was hired, CGL would "look at opportunities" for Plaintiff to move up in the Company.

## C. Defendants paid Plaintiff less than similarly situated female employees without justification.

34. Defendants paid similarly situated women a higher salary than Plaintiff.

35. Helgah Chebe ("Ms. Chebe") is female.

36. Ms. Chebe was employed by Defendants as an IT System Administrator.

37. Like Plaintiff, she was hired by Mr. Peraza.

38. She was so employed from on or around May 2, 2022, until her resignation on or around December 27, 2023.

39. Mr. Henderson's job function, skill, effort and responsibilities were similar to Ms. Chebe.

40. These duties included end-user support for Defendants' CMMS platform "Maintenance Connection," backend administration of Maintenance Connection, and generating reports inside the application, along with the separate, advanced tasks mentioned above.

41. Nevertheless, Ms. Chebe was paid approximately $44,000 more than Mr. Henderson.

42. There was no justification for this disparity in pay.

43. Vantrice Williams ("Ms. Williams") is also female.

44. Similar to Plaintiff, she was hired by Mr. Peraza.

45. Ms. Williams became employed by Defendants on or around March 14, 2022 until she was terminated in February 2023.

46. Ms. Williams was Mr. Henderson's CMMS IT Support Assistant counterpart with a similar written job description.

47. In practice however, Ms. Williams was less skilled and tasked with lesser responsibilities than Mr. Henderson.

48. For no justifiable reason, Ms. Williams was compensated approximately $8,200 more than Plaintiff.

49. On or about November 7, 2022, Defendant Campbell became the new IT Director and Plaintiff and other similarly situated women began reporting to him.

50. In January 2023, during Plaintiff's 2022 Annual Review, it was indicated that he "should be looked to for the next level."

51. Furthermore, in March 2023, Defendant Campbell promised to promote Plaintiff to an IT System Administrator role, acknowledging to Plaintiff that he was "already doing all of this," referring to IT System Administrator duties.

52. Instead, Defendant CGL promoted McKenzie Perry (formerly, Holloway), to CMMS IT Support Assistant.

53. Ms. Perry is female.

54. Ms. Perry had substantially fewer relevant qualifications. Specifically, she had no information technology-related education or experience whatsoever.

55. Upon promotion, Ms. Perry was compensated approximately $4,000 more than Plaintiff, even though Mr. Henderson had trained her and continued performing higher-level technical functions.

56. The promotion of a significantly less-qualified female employee at a higher rate of pay, while denying Mr. Henderson advancement, exemplified the sex-based wage discrimination and trajectory-stunting that persisted throughout his employment.

## D. Plaintiff complained about the disparity in wages between the sexes and was retaliated against for his complaints.

57. When, in April 2023, Plaintiff discovered that he was not receiving wages equal to Ms. Perry, he complained to Defendant Campbell and inquired again about the progress of being promoted to IT System Administrator.

58. Defendant Campbell failed to take remedial action, so Plaintiff continued to voice his dissatisfaction with the inequity being condoned and ratified by co-Defendants CGL and Hunt.

59. On or about October 12, 2023, Defendant Campbell and Mr. Westbrook held a disciplinary meeting with Plaintiff related to discussions of pay disparity, including discussions regarding Mr. Westbrook's salary that Plaintiff had engaged in with coworkers. Mr. Westbrook stated, "you are not allowed to talk about other people's salaries."

60. Later the same day, Defendant Campbell issued Plaintiff a "last step" disciplinary action authored by Defendant Hunt's Vice President of Human Resources, Jeanne Bosbach, and warned Plaintiff not to "push his luck" and that "they could have fired" him for discussing the unfairness of salaries.

61. Defendants doubled down on this retaliation when in March 2024, they denied Plaintiff his 2024 merit wage increase.

62. The reason explicitly given for the denial of the merit increase was Defendants' displeasure with Plaintiff having discussed salary disparities.

63. Mr. Henderson took Defendants' threats of termination seriously and tried to keep working in silence throughout 2024. However, he renewed his complaints in January 2025 and continued complaining through the remainder of his employment with Defendants.

64. Following these complaints, Defendants retaliated against Mr. Henderson in several ways, including but not limited to, refusing to promote him.

65.     In 2024, Mr. Henderson applied for three positions for which he was abundantly qualified.

66.     He was not promoted in favor of others who had not engaged in the FLSA and EPA protected activity of having complained of wage disparity.

**E. Defendant offered Plaintiff a sham promotion into an FLSA-misclassified exempt role.**

67.     On January 23, 2025, Mr. Henderson filed an internal complaint with then-Human Resources Director Kimberly Ranlett, notifying her of discrimination in promotions and other pay disparities.

68.     On January 27 and 28, 2025, Ms. Ranlett met with Plaintiff, conceded that his concerns "were a bigger problem than I had realized" and stated she would follow up with Defendant Campbell.

69.     Despite Ms. Ranlett's acknowledgement and promise to follow up, the next communication Plaintiff received was retaliation, not remedy.

70.     On February 11, 2025, Defendant Campbell presented a sham promotion offer that was, on its face, unlawful under the FLSA and retaliatory under the EPA (as well as other statutes that Plaintiff had complained about).

71.     Defendant Campbell and Ms. Ranlett acknowledged the retaliatory nature of the offer when Defendant Campbell stated this was because "[u]pper management is still pissed at you for what you did, and it was hard enough to even

10

get this" in reference to Plaintiff having discussed the wages of others. Ms. Ranlett added, "because what you did was a fireable offense."

72. The offer fell below the minimum compensation range set by Defendants for all employees occupying that role.

73. The offer was also significantly lower than the salary offered to another candidate in December 2024 with fewer qualifications, who had not engaged in protected activity.

74. Most alarmingly, it was clear that Defendant Campbell had taken Plaintiff's non-exempt CMMS/Cellular IT Support Assistant job description, exchanged CMMS tasks for "basic IT support," "Tier 1" duties and re-titled it as an exempt IT System Administrator role.

75. Accepting this role would have increased Plaintiff's salary but robbed him of the ability to earn overtime wages and to enjoy other protections of the Act.

**F. Plaintiff complained about the misclassification of the proposed new role which ultimately resulted in his termination.**

76. On the afternoon of February 19, 2025, Mr. Henderson objected to the "new" role noting the similarities between the two job descriptions and stating his belief that the duties were non-exempt help desk support tasks.

77. Plaintiff also stated he would accept the wage increase, but wished to retain his title, duties, job classification while Defendants continued the investigation into pay disparity.

11

78. That same evening, Ms. Ranlett rescinded the offer and mischaracterized Plaintiff's protected concerns as having "declined the position."

79. At the same time, Defendant Campbell revoked Plaintiff's Global Administrator Microsoft 365 role access in an attempt to further diminish him.

80. On March 12, 2025, Mr. Henderson met with Ms. Bosbach to discuss these and other incidents of retaliation for his having objected to the FLSA misclassification.

81. She promised to follow up but did not do so.

82. On June 6, 2025, Defendant Campbell claimed Plaintiff worked unauthorized overtime hours and in July 2025, Defendant CGL alleged that Mr. Henderson failed to appropriately assist with onboarding a new hire. These accusations were proven false with evidence from Defendants' own records.

83. Plaintiff continued to complain to Defendants including the newly hired Human Resource Director, Jade Alexander-Esteves, and to Human Resource Manager, Cathy Capers, because he had received no redress, only threats, hostility and adverse actions.

84. On August 14, 2025, Ms. Alexander-Esteves and Ms. Bosbach told Plaintiff that his allegations of retaliatory workplace conditions were "unsubstantiated."

85. The FLSA misclassification issue went unaddressed.

86.     Although Plaintiff was clearly qualified, on October 1, 2025, Defendant Campbell hired a contractor to fill an IT System Administrator role that would have constituted a promotion for Plaintiff.

87.     Retaliatory animus is demonstrated in the fact that the contractor had not engaged in protected activity as Mr. Henderson had done.

88.     On or about October 2, 2025, Plaintiff opposed this sixth retaliatory promotion denial in an email reply to Defendants. The email included a data-supported analysis of unlawful workplace inequities, including violations of the FLSA.[1]

89.     On October 9, 2025, Ms. Bosbach and Ms. Alexander-Esteves interrogated Mr. Henderson regarding this complaint. At that meeting, he reiterated his concerns regarding unlawful workplace practices and Ms. Alexander-Esteves failed in her attempts to fit the "new" role into the exempt classification.

90.     Fearing further retaliation based on Ms. Bosbach's comments, Plaintiff emailed another complaint to Ann Patrick, Chief Human Resource Officer for Defendant Hunt and Ms. Bosbach's supervisor, on October 15, 2025.

91.     This email summarized Ms. Bosbach's response, including several concerning admissions of discrimination and retaliation.

---

[1] Plaintiff also raised complaints under Title VII of the Civil Rights Act of 1964 and National Labor Relations Act complaints which are being investigated by federal administrative agencies and are not yet the subject of litigation.

13

92. Ms. Patrick responded on October 16, 2025, promising to investigate.

93. However, on that same day, Ms. Alexander-Esteves and Defendant Campbell terminated Plaintiff's employment explicitly because of his October 2nd and 15th complaints.

94. Ms. Patrick attended the termination meeting briefly via telephone.

95. Ultimately, throughout Plaintiff's employment, Defendants deliberately avoided addressing the wage disparity and intentionally sought to misclassify and suppress his compensation.

**COUNT I**
**Unequal Pay in Violation of the Equal Pay Act**
**(29 U.S.C. § 206(d)(1))**
**All Defendants**

96. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

97. Defendants paid Plaintiff less than his female counterparts for substantially similar jobs requiring equal or substantially similar skill, effort, and responsibility under similar working conditions.

98. The difference in pay was not justified by a seniority system, a merit system, or any other system which measures earnings by quantity or quality of production. Nor was the pay differential based on any factor other than sex.

99. Defendants' actions constitute willful and unreasonable violations of the EPA, in part because Plaintiff brought the pay discrepancies to the attention of

14

the Defendants and, not only did they fail to correct the discrepancies, they retaliated against Plaintiff for complaining.

100. Defendants also engaged in wage and position trajectory stunting by denying Plaintiff advancement opportunities, which constitutes harm to the terms, conditions, or privileges of his employment.

101. As a direct and proximate result of Defendants' violations of the EPA, Plaintiff has suffered damages, including back pay, front pay, liquidated damages, and other monetary losses including attorneys' fees and expenses.

**COUNT II**
**Retaliation in Violation of the Equal Pay Act**
**(29 U.S.C. § 215(a)(3))**
**All Defendants**

102. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

103. Plaintiff engaged in protected activity under the EPA when in April 2023 and on subsequent dates, he complained that he was being paid significantly less than his female counterparts for substantially similar duties and work.

104. Immediately after each complaint, Defendants took adverse actions, including but not limited to: (a) restricting Plaintiff's 2024 merit increase; (b) removing his access to key systems; (c) accusing him of attendance-related misconduct; (d) accusing him of performance-related misconduct; and (e) terminating his employment.

15

105. The proximate timing and pretextual circumstances of these actions demonstrate a causal connection between those actions and his protected activity.

106. Defendants' actions constitute willful and unreasonable violations of the EPA, in part because the corporate Defendants are sophisticated parties that knew or should have known these violations were occurring.

107. As a direct and proximate result of Defendants' violations of the EPA, Plaintiff has suffered damages, including back pay, liquidated damages, other monetary losses and attorneys' fees, costs and expenses.

## COUNT III
### Retaliation in Violation of the Fair Labor Standards Act
### (29 U.S.C. § 215(a)(3))
### All Defendants

108. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

109. Plaintiff engaged in protected activity under the FLSA by repeatedly complaining—both orally and in writing—about misclassification and related wage issues, including his February 2025 misclassification objections.

110. Defendants retaliated against Plaintiff for his complaints by terminating him the day after he made his last complaint to Defendants' CHRO, Ms. Patrick.

111. The temporal proximity and circumstances of Plaintiff's termination demonstrate a causal connection to his protected activity.

16

112.   Defendants' actions constitute willful violations of the FLSA, in part because Plaintiff brought misclassification concerns to the attention of the Defendants and they refused to investigate and instead retaliated against Plaintiff.

113.   As a direct and proximate result of Defendants' wage disparity and retaliatory termination of Plaintiff, he has suffered extensive back pay damages beginning on March 14, 2022, as well as attorneys' fees, costs and expenses incurred in prosecuting these claims.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in his favor and award the following relief:

a. A declaration that Defendants have violated the EPA and the FLSA;

b. A declaration that Defendants' violations of the EPA and the FLSA were unreasonable and willful;

c. An injunction prohibiting Defendants from further EPA violations and requiring merit-based policies and third-party compliance audits;

d. An award of back and/or pay;

e. An award of liquidated and/or punitive damages in an equal amount to the backpay;

f. An award of pre-judgment and post-judgment interest;

g. An award of compensatory and/or special damages;

17

h.  An award of reasonable attorneys' fees, costs and expenses incurred in prosecuting these claims; and

i.  such other relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all claims so triable.

Respectfully submitted this 14th day of February 2026.

/s/Sherifat O. Oluyemi
Sherifat O. Oluyemi
Georgia Bar No.: 254547
LAW OFFICE OF SHERI OLUYEMI LLC
2727 Paces Ferry Rd. SE,
Building 1, Suite 750
Atlanta, GA 30339
Tel: 404-500-6202
Fax: 404-496-7202
soluyemi@losollc.com