# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| JEREL HENDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. |
| | ) | **1:26-cv-00886-TWT-CMS** |
| CGL COMPANIES, LLC and | ) | |
| HUNT COMPANIES BUSINESS | ) | **JURY TRIAL DEMANDED** |
| SERVICES, LLC, and MARK | ) | |
| CAMPBELL, | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

COMES NOW Plaintiff Jerel Henderson ("Plaintiff" or "Mr. Henderson"), and by and through his undersigned counsel, hereby brings the following claims against Defendants CGL Companies, LLC, Hunt Companies Business Services, LLC and Mark Campbell (collectively "Defendants"). In support thereof, Plaintiff states the following:

## INTRODUCTION

1.     This action seeks damages for wage discrimination in violation of the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. 206(d), *et seq.;* retaliation in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*.; and race and sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of

1964, as amended, 42 U.S.C. § 2000e, *et seq* and the Lilly Ledbetter Fair Pay Act of 2009, 42 U.S.C. § 2000e-5(e)(3).

2.      Jerel Henderson was subjected to discrimination because of his race and sex and retaliated against for opposing that unlawful conduct. His experience was not an isolated incident but rather reflected a workplace environment in which discrimination was tolerated, opposition to illegality was met with reprisal, and an employee who insisted on fairness was systematically oppressed.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over Plaintiff's EPA, FLSA, and Title VII claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b).

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and Rule 3.1 of the Local Rules of the Northern District of Georgia because Defendants transact business in this judicial district and the events giving rise to these claims occurred in this judicial district and division.

## PARTIES

5.      Plaintiff Jerel Henderson is, and at all times relevant to the Complaint was, an adult resident of Atlanta, Fulton County, Georgia.

6.      At all times relevant to this Complaint, Plaintiff was an employee of the Defendants as defined by the FLSA. 29 U.S.C. § 203(e)(1).

2

7. Plaintiff is, and at all times relevant to the Complaint was, protected by the FLSA because his work for Defendants regularly involved interstate commerce.

8. Defendant CGL Companies, LLC ("CGL"), is a foreign limited liability company wholly owned by Defendant Hunt.

9. Defendant CGL's principal place of business is 601 North Mesa, Suite 1900, El Paso, Texas 79901.

10. Defendant CGL conducts business in the state of Georgia at two addresses: 11175 Cicero Drive Suite 500 Alpharetta, Georgia 30022 and 1903 Phoenix Blvd Suite 250, Atlanta, Georgia 30349.

11. Defendant Hunt Companies Business Services, LLC ("Hunt"), is a foreign limited liability company, with its principal place of business located at 601 North Mesa, Suite 1900, El Paso, Texas 79901.

12. Defendant Mark Campbell ("Campbell") is an adult who, upon information and belief, resides in Gainesville, Hall County, Georgia.

13. At all times relevant to this Complaint, Defendant Campbell was a manager who exercised operational control over pay practices and participated in hostile retaliatory actions, based on his direct role in enforcing compensation decisions, denying Plaintiff's advancement, diluting promotions, and enforcing upper-management's hostility toward protected pay discussions.

3

14.   At all times relevant to this Complaint, Defendants were Plaintiff's employers, as defined by the FLSA. 29 U.S.C. § 203(d).

15.   Defendants CGL and Hunt are enterprises covered by the FLSA and Title VII, as they have fifteen (15) or more employees and an annual dollar volume of sales or business of at least $500,000.

16.   Defendants CGL and Hunt may both be served with the Summons and Complaint through their registered agent, Capitol Corporate Services, Inc., 3675 Crestwood Parkway, N.W., Suite 350, Duluth, Georgia 30096 in Gwinnett County.

17.   Defendant Campbell may be served at Defendant CGL's business locations or at his home which, upon information and belief, is located at 7374 Berry Hill Dr., Gainesville, GA 30507 in Hall County.

## ADMINISTRATIVE REMEDIES

18.   All conditions precedent to filing suit have been satisfied.

19.   Mr. Henderson timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 28, 2025, designated EEOC Charge No. 410-2025-05730 which was amended on August 18, 2025. See, Exhibit A and Exhibit B, respectively.

20.   The EEOC issued a Notice of Right to Sue to Mr. Henderson on March 4, 2026. See, Exhibit C.

4

21. As such, Plaintiff has satisfied all administrative exhaustion requirements for his Title VII claims.

## STATEMENT OF FACTS

**A. Defendants CGL and Hunt operated as joint employers or, in the alternative, as a single integrated enterprise.**

22. Defendant CGL provides justice facility planning, design, program management, maintenance, and condition assessment consulting nationwide.

23. Defendant Hunt provides operational and administrative direction and support to Defendant CGL through shared resources in the Human Resources, Accounting, and Finance Departments.

24. For example, Defendant CGL's Human Resource Director reports to Defendant Hunt's Vice President of Human Resources.

25. Defendant Hunt exercises a high degree of control over the terms and conditions of CGL employees, including the Plaintiff and, as such, is a joint or single enterprise employer along with Defendant CGL.

**B. Defendants hired Plaintiff who performed excellently in his role.**

26. Plaintiff, Mr. Henderson, is an African American male.

27. Mr. Henderson holds a Bachelor of Science in Electrical Engineering from an ABET-accredited university, along with several years of in-person participation with Holberton School, a computer science and full stack software engineering program based in San Francisco, California.

28.    Plaintiff was hired by the Defendants on or about February 28, 2022, as a CMMS/Cellular IT Support Assistant.

29.    Plaintiff worked at Defendant CGL's office located at 1903 Phoenix Blvd., Suite 250, Atlanta, Georgia 30349.

30.    His base salary at hire was $47,840.

31.    Defendants classified Plaintiff's role as FLSA non-exempt.

32.    From his start date through October 16, 2025, Plaintiff earned and was paid approximately $35,634.39 in overtime wages.

33.    As a CMMS/Cellular IT Support Assistant, Plaintiff reported first to Michael Peraza, Director of IT.

34.    Mr. Peraza reported to Eli Gage, the current Chief Executive Officer.

35.    Plaintiff was required to, and did excellently perform, job functions that far exceeded his capacity as CMMS/Cellular IT Support Assistant.

36.    Specifically, beginning March 14, 2022, Mr. Henderson absorbed the non-managerial technical duties of the former IT Program Manager, Joseph "Bob" Cole, and performed at or above the level of an FLSA exempt IT System Administrator, which involved more complicated and consequential tasks.

37.    Following Mr. Peraza's resignation in September 2022, Greg Westbrook, current Chief Operations Officer, relied on Plaintiff to lead the IT team.

38. In October 2022, Mr. Westbrook told Plaintiff that once a new IT Director was hired, CGL would "look at opportunities" to promote Plaintiff.

**C. Defendants paid Plaintiff less than similarly situated female employees without justification.**

39. Helgah Chebe ("Ms. Chebe") is female.

40. Ms. Chebe was employed by Defendants as an IT System Administrator, though her title was falsely characterized by Defendants as "Database Administrator."

41. Like Plaintiff, she was hired by Mr. Peraza.

42. She was so employed from on or around May 2, 2022, until her resignation on or around December 27, 2023, when her true job title was revealed.

43. Mr. Henderson's job description was similar to Ms. Chebe's, but his function, skill, effort and responsibilities exceeded hers.

44. These duties included end-user support for Defendants' CMMS (Computer Maintenance Management System) platform "Maintenance Connection," backend administration of and generating reports inside Maintenance Connection along with the separate, advanced tasks mentioned above.

45. Nevertheless, Ms. Chebe was paid approximately $44,000 more than Mr. Henderson.

46. Vantrice Williams ("Ms. Williams") is also female.

47. Similar to Plaintiff, she was hired by Mr. Peraza.

7

48.    Ms. Williams became employed by Defendants on or around March 14, 2022, until she was terminated in February 2023.

49.    Ms. Williams was Mr. Henderson's CMMS IT Support Assistant counterpart with a similar written job description.

50.    In practice however, Ms. Williams was less skilled and tasked with lesser responsibilities than Mr. Henderson.

51.    Ms. Williams was compensated approximately $8,200 more than Plaintiff.[1]

52.    On or about November 7, 2022, Defendant Campbell became the new IT Director. Plaintiff and other similarly situated women began reporting to him.

53.    Upon information and belief, Defendant Campbell was terminated from his previous IT Director position for making racially denigrating epithets, including using the "n-word."

54.    In or around February 17, 2023, Defendant CGL hired Crystal Singletary to the position of CMMS Administrator.

55.    Ms. Singletary is a White female.

56.    Ms. Singletary was an external candidate, and alleviated Mr. Henderson of CMMS duties he had performed after Bob Cole's sudden termination in March 2022.

---

[1] Mr. Henderson discovered this fact on September 10, 2025.

57.    She, like Mr. Henderson, reported to Defendant Campbell.

58.    By Ms. Singletary's own admissions to Mr. Henderson and other CGL employees throughout 2023, she had never worked with any CMMS prior to onboarding with CGL.

59.    Ms. Singletary was compensated approximately \$42,000 more than Plaintiff at the time of her hiring[2] and eventually promoted to Senior CMMS Administrator.

60.    In March 2023, Defendant Campbell promised to promote Plaintiff to an IT System Administrator role, acknowledging to Plaintiff that he was "already doing all of this," referring to IT System Administrator duties.

61.    Instead, Defendant CGL promoted McKenzie Perry (formerly, Holloway), who previously held the title General Trades Swimming Pool Technician, to CMMS IT Support Assistant.

62.    Ms. Perry is a White female.

63.    Ms. Perry had substantially fewer relevant qualifications. Specifically, she had no information technology-related education or experience whatsoever and reported to Defendant Campbell.

---

[2] Mr. Henderson learned of this fact on September 10, 2025.

64.    Upon promotion, Ms. Perry was compensated approximately $4,000 more than Plaintiff, even though Mr. Henderson had trained her and continued performing higher-level technical functions.

65.    Plaintiff's primary duties and those of Ms. Chebe, Ms. Williams, Ms. Singletary, and Ms. Perry required equal skill, effort, and responsibility, and were performed under similar work conditions.

66.    However, there was no justification for the disparity in pay. Specifically, the difference in pay between Plaintiff, Ms. Chebe, Ms. Williams and Ms. Singletary and Ms. Perry's salaries was not justified by a seniority system, merit system, or any other system which measures earnings by quantity or quality of production. Nor was the differential based on any factor other than sex and/or race.

67.    The foregoing demonstrates Defendants' documented scheme in which significantly less-qualified female and substantially less experienced White employees were hired, promoted and compensated at higher rates of pay than Mr. Henderson, exemplifying the sex and race-based wage discrimination pattern and willful trajectory-stunting that persisted throughout his employment.

**D. Plaintiff complained about the disparity in wages between the sexes and was retaliated against for his complaints.**

68.    When, in April 2023, Plaintiff discovered that he was not receiving wages equal to Ms. Perry, he complained to Defendant Campbell and inquired again about the progress of being promoted to IT System Administrator.

69. Defendant Campbell failed to take remedial action, so Plaintiff continued to voice his dissatisfaction with the inequity being condoned and ratified by Defendant CGL and Hunt.

70. This includes numerous discussions of Defendant CGL's discriminatory treatment of Black employees with in-office coworkers, as well as technicians who worked at Defendant CGL's managed facilities.

71. After each instance, Defendant Campbell continued to reassure Mr. Henderson that the promotion would be forthcoming, and that he was in communication with Mr. Westbrook about the opportunity.

72. On or around August 25, 2023, Mr. Henderson received a nuisance adjustment, placing his salary just above Ms. Perry's. No explanation or justification was given as to the abandoned commitment to Plaintiff's promotion.

73. Following the unexplained promotion denial, Mr. Henderson became aware Defendant Campbell denigrated Plaintiff to his colleagues, including calling him a "minor baby in the IT world" via Microsoft Teams on September 1, 2023.

74. Throughout September 2023, Defendant Campbell engaged in numerous acts of belittling and defamation, including marking several of Plaintiff's formerly completed projects as "late/incomplete."

11

75. Mr. Henderson shared these acts of retaliation with Defendant CGL's Human Resources Manager, Cathy Capers, in January 2024 during Ms. Capers' investigation into Defendant Campbell's discriminatory harassment of Ms. Chebe.

76. At the time, Ms. Capers, who reported directly to Defendant Hunt's Vice President of Human Resources, Jeanne Bosbach, made Ms. Bosbach aware of the results of her investigation.

77. On or about October 12, 2023, Defendant Campbell and Mr. Westbrook held a disciplinary meeting with Plaintiff related to discussions of pay disparity, including discussions regarding Mr. Westbrook's salary that Plaintiff had engaged in with coworkers. In one such conversation, Mr. Henderson had complained that Defendant CGL inequitably compensated Black women because of their race and sex, despite having the resources to provide better compensation.

78. Mr. Westbrook personally sought to retaliate against Mr. Henderson for disclosing his salary and stated, "you are not allowed to talk about other people's salaries."[3]

79. Later the same day, Defendant Campbell issued Plaintiff a "last step" disciplinary action drafted by Ms. Bosbach for discussing the "unfairness of salaries" and also warned Plaintiff not to "push his luck" and that "they could have fired" him.

---

[3] Defendants' stated rule and disciplinary action prohibiting the disclosure of others' salaries in an equity context is being investigated by the National Labor Relations Board as an Unfair Labor Practice.

80. Defendants doubled down on hostility when, in March 2024, they denied Plaintiff his 2024 merit wage increase.

81. The reason explicitly given for the denial of the merit increase was Defendants' displeasure with Plaintiff having discussed salary disparities.

82. Mr. Henderson took Defendants' threats of termination seriously and tried to keep working in silence throughout 2024. However, he renewed his complaints in January 2025 and continued complaining through the remainder of his employment with Defendants.

83. Until this end, Defendants continued to subject Mr. Henderson to harassment through various adverse employment actions, including but not limited to, refusing to promote or compensate him equitably.

**E. Defendants' Failed to Promote Plaintiff to Roles for Which He was Abundantly Qualified.**

84. In 2024, Mr. Henderson applied and interviewed for three positions for which he was abundantly qualified.

85. He was not promoted in favor of others who were outside of his protected class, who were either White or had not engaged in the protected activity of having complained of wage disparity and racial discrimination.

86. The promotion of Ms. Singletary—which Defendant Campbell advocated for even after CMMS moved from IT to Operations—on or around

August 30, 2024, to a senior administrator role underscored Defendants' race and sex-based discriminatory compensation scheme against Mr. Henderson.

87. In or around November 2024, Mr. Henderson applied for a promotion for the Microsoft Dynamics 365 System Administrator position.

88. Mr. Henderson was abundantly qualified for the role, having been provided complete access to the platform by Mr. Peraza in or around April 2022 and having been the application's primary administrator since that point.

89. Defendant Campbell stated the reason Mr. Henderson was not eligible for the position was that Mr. Westbrook would not want Plaintiff to have access to company financials.

90. This pretextual justification was peculiar, as Mr. Henderson never lost access to Dynamics 365—or any other CGL system—following his October 2023 discipline for having "conversations with coworkers" about Defendant CGL's inequitable compensation practices.

91. In or around January 2025, Plaintiff learned that Defendant Campbell had promoted Kory Illenye, a White coworker who was a Maintenance Facility Manager, for the Dynamic 365 position, despite not having the qualifications stated in the job announcement. Like Ms. Perry, Mr. Illenye had no information technology-related education or experience whatsoever.

92. Defendants' ongoing discriminatory compensation scheme against Plaintiff solidified upon Mr. Illenye's promotion.

93. On January 23, 2025, Mr. Henderson filed an internal complaint with Defendant CGL's then-Human Resources Director Kimberly Ranlett, who was hired in or around April 2024 and reported to Ms. Bosbach, notifying her of discrimination in promotions and other pay disparities.

94. On January 27, 2025, Ms. Ranlett met with Plaintiff and initially defended Defendants' decisions to withhold advancement from Mr. Henderson but then conceded that his concerns "were a bigger problem than I had realized" and stated she would follow up with Defendant Campbell.

95. On January 28, 2025, Ms. Ranlett told Mr. Henderson that a promotion acknowledging the duties he had performed since February 2022 and rectifying his under compensation was in the works.

96. Despite Ms. Ranlett's acknowledgement and promises, the next communication Plaintiff received was retaliation, not remedy.

**F. Defendant offered Plaintiff a sham promotion into an FLSA-misclassified exempt role.**

97. On February 11, 2025, Defendant Campbell presented a sham promotion offer for an IT System Administrator position that was, on its face, unlawful under the "Computer Professionals" exemption of the FLSA and retaliatory under Title VII and the EPA.

98. Defendant Campbell acknowledged the retaliatory nature of the offer when he stated, "[u]pper management is still pissed at you for what you did, and it was hard enough to even get this [amount]" in reference to Plaintiff having discussed the wages of others.

99. The offer fell below the minimum compensation range set by Defendants for all employees occupying that role.

100. The offer was also significantly lower than the salary offered to Mr. Illenye in December 2024, who possessed fewer qualifications, who had not engaged in protected activity, and who was White.

101. Most alarmingly, it was clear that Defendant Campbell had taken Plaintiff's non-exempt CMMS/Cellular IT Support Assistant job description, exchanged CMMS tasks for "basic IT support," "Tier 1" duties and re-titled it as an exempt IT System Administrator role.

102. Neither Ms. Perry, nor Ms. Singletary or Mr. Illenye's job descriptions—all mid- or senior-level roles—were altered to "reflect … foundational language appropriate for" their "transition."

103. Accepting this FLSA misclassified role would have increased Plaintiff's salary but robbed him of the ability to earn overtime wages and to enjoy other protections of the Act.

16

104. On February 17, 2025, although Ms. Ranlett again acknowledged Plaintiff's under-compensation, she also justified Defendant Campbell's remarks, stating "because what you did was a fireable offense." She also added that Mr. Henderson could not expect to be compensated similarly to Ms. Chebe's pay, because "[h]iring employees is like playing the stock market."

## G. Plaintiff complained about the proposed new role because it was misclassified and, in not being a true promotion, was retaliatory.

105. On the afternoon of February 19, 2025, Mr. Henderson objected to the "new" role noting the similarities between the two job descriptions and stating his belief that the duties were non-exempt help desk support tasks.

106. Plaintiff also stated he would accept the pay increase, but wished to retain his title, duties, and job classification while Defendants continued the investigation into pay disparity.

107. That same evening, Ms. Ranlett rescinded the offer and mischaracterized Plaintiff's protected concerns as having "declined the position."

108. At the same time, Defendant Campbell revoked Plaintiff's Global Administrator Microsoft 365 access role in an attempt to further diminish him.

109. The next day, on February 20, 2025, Ms. Ranlett's employment was terminated by Defendant Hunt. Defendant Campbell disabled access to her account that same day.

17

110. On February 28, 2025, Mr. Henderson filed an EEOC Charge designated Charge No. 410-2025-05730. Ex. A.

111. Defendants first accessed the EEOC Charge on March 3, 2025, at 10:49 am.

112. At 11:51 am on the same day, Defendant Campbell created a retention policy on Defendants' company-wide IT system, automatically deleting all instant messages sent or received via Microsoft Teams older than thirty (30) days.

113. Defendant Campbell justified this destruction of records to System Administrator Tedron Branford, stating "chat groups are a liability."

114. At 12:59 pm on the very same day, Defendant Campbell re-enabled the previously disabled Microsoft 365 account belonging to Ms. Ranlett and eventually succeeded in granting himself access to her account—logging into her former laptop at 4:05 pm, and the Microsoft Teams and Outlook applications at around 4:32 pm.

115. On March 12, 2025, Mr. Henderson discussed the new scrutiny and retaliation for his having objected to the FLSA misclassification and filed the EEOC Charge with Ms. Bosbach. She promised to follow up but did not do so.

116. Defendants continued engaging in retaliatory hostility, scrutinizing Mr. Henderson's attendance and performance in an effort to manufacture pretextual cause to terminate him.

117. For example, on March 31, 2025, Defendant Campbell informed Mr. Henderson that he was monitoring Plaintiff's outbound external emails.

118. On June 6, 2025, Defendant CGL suddenly interrogated Plaintiff, falsely accusing him of lateness and working unauthorized overtime hours.

119. Throughout July 2025, Defendant CGL alleged that Mr. Henderson failed to appropriately assist with onboarding new hires.

120. Each time, Mr. Henderson proved these accusations false using evidence from Defendants' own records.

121. Plaintiff continued to complain to HR including newly hired CGL Human Resource Director, Jade Alexander-Esteves, and to Ms. Capers, because he had received no redress, only threats, hostility and adverse actions.

122. On August 14, 2025, Ms. Alexander-Esteves and Ms. Bosbach told Plaintiff that his allegations of retaliatory workplace conditions were "unsubstantiated" and FLSA misclassification and discrimination issues went unaddressed.

**H. Additional Facts Establishing a Timeline for Back Pay Relief Request.**

123. On August 21, 2025, Defendant Campbell sent a department-wide email directing the team to "collaborate on refining and improving our core processes" as a "homework" assignment.

124. On October 2, 2025, Mr. Henderson, after an outside contractor was hired to support a vacancy left by Mr. Branford's medical leave of absence, responded to the August 21 email with data supporting his FLSA and Title VII concerns, stating that treating Black employees equitably with White peers and contracting hourly IT staff to perform non-exempt IT duties would be a core improvement that would benefit the department.

125. On October 9, 2025, Ms. Bosbach and Ms. Alexander-Esteves interrogated Mr. Henderson, accusing him of "dragging others onto his train of disparity" and discussing his discrimination at CGL with other coworkers. The details of these alleged discussions were withheld.

126. Concerned with Defendant HR's behavior and several potential unlawful admissions during this meeting, Mr. Henderson escalated his complaints to Defendant Hunt's Executive Vice-President Human Resources/Chief Human Resources Officer Ann Patrick on October 15, 2025.

127. Ms. Patrick responded the next day, October 16, stating she would investigate and asked that Mr. Henderson provide her with any new information. Around three hours later, Defendants terminated Mr. Henderson's employment, explicitly because of his October 2nd complaint.

128. Ultimately, like so many other Black employees whom Mr. Henderson encountered while working for Defendants, Defendants deliberately suppressed his

compensation and avoided addressing the wage and racial disparity issues rampant throughout Defendant CGL and endorsed by Defendant Hunt.

<u>**COUNT I**</u>
**Unequal Pay in Violation of the Equal Pay Act**
**(<u>29 U.S.C. § 206(d)(1)</u>)**
**All Defendants**

129.   Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

130.   Defendants paid Plaintiff less than his female counterparts for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

131.   More specifically, the primary duties of Plaintiff's job, not duties that are incidental or insubstantial, and the jobs performed by his female counterparts were the same or sufficiently similar.

132.   The difference in pay between Plaintiff and his female counterparts was not justified by a seniority system, a merit system, or any other system which measures earnings by quantity or quality of production. Nor was the pay differential based on any factor other than sex.

133.   Defendants' actions constitute willful and unreasonable violations of the EPA, in part because Plaintiff brought the pay discrepancies to the attention of the Defendants and, not only did they fail to correct the discrepancies, but they also retaliated against Plaintiff for complaining.

21

134. As a direct and proximate result of Defendants' violations of the EPA, Plaintiff has suffered damages beginning on March 14, 2022, including back pay, liquidated damages, other monetary losses including attorneys' fees, costs and expenses.

### COUNT II
**Race and Sex Discrimination in Violation of
Title VII as amended by the Lilly Ledbetter Fair Pay Act
(42 U.S.C. §2000e-2 *et seq*)
Defendants Hunt and CGL**

135. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

136. Plaintiff was subjected to disparate treatment based on his race and sex in violation of Title VII, 42 U.S.C. § 2000e-2(a) as amended by Lilly Ledbetter Fair Pay Act.

137. Plaintiff is a member of a protected class because he is an African American man.

138. He was paid less than similarly situated Caucasians and women, to perform a similar job, even though he was equally, or more, qualified than they were.

139. Each paycheck Plaintiff received from February 2023 forward perpetuated Defendants' discriminatory compensation decisions, constituting an independently actionable violation of Title VII.

140. Defendants' discriminatory compensation decisions were willful. Defendants were aware of the compensation disparities, acknowledged them internally, and deliberately chose not to remedy them.

141. As a direct and proximate result of Defendants' discriminatory compensation scheme, Plaintiff suffered pecuniary damages including back pay, attorneys' fees and costs of this litigation, as well as non-pecuniary damages, emotional distress, pain and suffering.

**COUNT III**
**Retaliation in Violation of the Equal Pay Act**
**(29 U.S.C. § 215(a)(3))**
**All Defendants**

142. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

143. Plaintiff engaged in protected activity under the EPA when in April 2023 and on subsequent dates, he complained that he was being paid significantly less than his female counterparts for substantially similar duties and work.

144. Immediately after each complaint, Defendants took adverse actions, including but not limited to: (a) abandoning Plaintiff's promised promotion after he brought disparity concerns to their attention throughout 2023; (b) disciplining him for having "unprofessional conversations" about "unfairness of salaries;" (c) restricting his 2024 merit increase; (d) accusing him of performance-related misconduct; and (e) denying advancement to him multiple times.

145.   The proximate timing and pretextual circumstances of these actions demonstrate a causal connection between those actions and Plaintiff's protected activity.

146.   Defendants' actions constitute willful and unreasonable violations of the EPA, in part because the corporate Defendants are sophisticated parties that knew or should have known these violations were occurring.

147.   As a direct and proximate result of Defendants' violations of the EPA, Plaintiff has suffered damages, including back pay, liquidated damages, other monetary losses and attorneys' fees, costs and expenses.

**<u>COUNT IV</u>**
**Retaliatory Harassment,**
**or in the alternative, Hostile Work Environment**
**in Violation of Title VII (<u>42 U.S.C. §2000e-2(a)</u> *et seq*)**
**Defendants Hunt and CGL**

148.   Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

149.   Plaintiff complained to management, including but not limited to, Ms. Capers, Ms. Ranlett, Ms. Bosbach and Ms. Patrick.

150.   Shortly after each of these complaints, and in some cases, Defendants stated that because of some of these complaints, Plaintiff was subjected to retaliatory harassment because of that opposition to Defendants' unlawful compensation practices, in violation of Title VII, <u>42 U.S.C. § 2000e-2(a)</u>.

151. Beginning on or around August 2023 and continuing through August 14, 2025, Defendants subjected Plaintiff to a pattern of hostile conduct, including but not limited to: (a) disparaging him to colleagues using racially coded language; (b) issuing pretextual discipline for protesting compensation differences and discussing salary disparities; (c) denying merit increases and other salary advancement opportunities; (d) surveilling his communications and attendance; and (e) manufacturing false accusations of performance misconduct.

152. All of this hostile and retaliatory conduct was more than petty slights or minor annoyances but instead constituted actions that might dissuade a reasonable employee from making or supporting a complaint of discrimination.

153. Each constituent act was part of a single unlawful employment practice with the limitations period running from the last act in the continuing violation or harassment resulting in discrete adverse actions.

154. As a direct and proximate result of Defendants' statutory violations, Plaintiff suffered pecuniary damages including back pay, attorneys' fees and costs as well as non-pecuniary damages, emotional distress, pain and suffering.

## COUNT V
**Retaliation in Violation of the Fair Labor Standards Act**
**(29 U.S.C. §215(a)(3))**
**All Defendants**

155. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

156.   Plaintiff engaged in protected activity under the FLSA by repeatedly complaining—both orally and in writing—about misclassification and related wage issues, including his February 2025 objections to job misclassification and Defendants' attempt to place him in an exempt role filled with non-exempt duties.

157.   Defendants retaliated against Plaintiff for his complaints by (a) rescinding the salary increase offered and refusing to investigate further; (b) removing his access to key systems; (c) accusing him of attendance-related misconduct; (d) accusing him of performance-related misconduct; and (e) failing to promote him.

158.   These actions would not have been taken "but for" Plaintiff's assertion of his FLSA rights and the relevant decision-makers in this case were aware of his protected activity.

159.   The close temporal proximity between the Plaintiff's protected activity and the adverse actions suffered by Plaintiff demonstrate that the protected activity and the adverse actions were not wholly unrelated and that a causal connection to his protected activity exists.

160.   Defendants' actions constitute unreasonable and willful violations of the FLSA, in part because Plaintiff brought misclassification concerns to the attention of the Defendants and they refused to investigate and instead retaliated against Plaintiff.

161. As a direct and proximate result of Defendants' FLSA violations, Plaintiff has suffered extensive back pay damages, liquidated damages, other monetary losses including attorneys' fees, costs and expenses incurred in prosecuting these claims.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in his favor and award the following relief:

a.      A declaration that Defendants have violated the EPA, the FLSA, and Title VII;

b.      A declaration that Defendants' violations of the EPA, the FLSA, and Title VII were unreasonable and willful;

c.      An injunction prohibiting Defendants from further EPA, FLSA, and Title VII violations and requiring merit-based policies and third-party compliance audits;

d.      An award of back pay;

e.      An award of liquidated damages in an equal amount to the backpay;

f.      An award of pre-judgment and post-judgment interest;

g.      An award of compensatory and/or special damages;

h.      An award of punitive damages;

i.      An award of reasonable attorneys' fees, costs and expenses incurred in prosecuting these claims; and

j.      such other relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all claims so triable.

Respectfully submitted this 29th day of May 2026.

/s/Sherifat O. Oluyemi
Sherifat O. Oluyemi
Georgia Bar No.: 254547
LAW OFFICE OF SHERI OLUYEMI LLC
2727 Paces Ferry Rd. SE,
Building 1, Suite 750
Atlanta, GA 30339
Tel: 404-500-6202
Fax: 404-496-7202
soluyemi@losollc.com
*Attorney for Plaintiff*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing has been prepared using 14-pt Times New Roman

Font as approved by the Court in Local Rule 5.1.

Respectfully submitted this 29th day of May 2026.

/s/Sherifat O. Oluyemi
Sherifat O. Oluyemi
Georgia Bar No.: 254547
LAW OFFICE OF SHERI OLUYEMI LLC